# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MERIAM RATNER, Individually and On Behalf of All Others Similarly Situated, ) ) ) | **Case No.** |
| Plaintiffs, ) ) | **CLASS ACTION** |
| v. ) ) | **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITES LAWS** |
| OVASCIENCE, INC., MICHELLE DIPP, and CHRISTOPHER A. BLECK, ) ) ) | |
| Defendants. ) ) | **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Meriam Ratner ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding OvaScience, Inc. ("OvaScience" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased OvaScience securities between February 25, 2013 and September 10, 2013, inclusive (the "Class Period"), seeking to recover damages caused by

defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       Based upon the scientific research of co-founder, Dr. Jonathan Tilly, and financed by venture capitalists, OvaScience is a biotechnology company focused on the discovery, development and commercialization of novel treatments for infertility, with the primary goal of creating "healthy live births."  The Company's patented technology is based on recent scientific discoveries identifying egg precursor cells (EggPC$^{SM}$) in the ovaries, which are believed to have the potential to mature into fertilizable eggs.  The Company's first product candidate is AUGMENT, a process which involves removing mitochondria from a woman's egg precursor cells and injecting them into one of her egg cells, along with a sperm cell, during *in vitro* fertilization ("IVF"), in the hope of improving the chances for development of a viable embryo.

3.       AUGMENT, like the Company's other potential products, has not been tested in humans, and it is still unknown whether it is safe or efficacious for either the mothers or the children that may result from this IVF procedure.  In addition, this technology, which essentially aims to create babies, has sparked debate among doctors and bioethicists about the implications of bioengineering human beings, including the increased risk of transmitting genetic disease and the unknown effects on future generations.  In fact, the Cellular, Tissue, and Gene Therapies Advisory Committee of the FDA recently convened to discuss mitochondrial manipulation technologies, such as AUGMENT, and noted that "[t]he full spectrum of risks associated with oocyte/embryo manipulation in preventing transmission of mitochondrial diseases or for treatment of female infertility has yet to be identified."  Thus, because "thorough consideration of the potential risks and benefits for the study subjects and their children" is required before any

testing of these new technologies takes place in humans, the FDA is still evaluating how clinical trials should be designed to ensure the safety of women and children.

4.     Despite these medical and ethical considerations, Ovascience developed a business plan that sought to reward its private investors and ensure the Company's financial viability by commercializing AUGMENT as quickly as possible, no matter the consequences.  Part of this plan involved launching a first-in-human clinical trial (the "AUGMENT Study"), which would provide data to substantiate the Company's claims in marketing materials.  In order for this plan to succeed, Ovascience needed to short-circuit the time-consuming and expensive pre-market review requirements and approval process typically imposed by the U.S. Food and Drug Administration ("FDA") as part of its mission to protect the public health, which can require submission of an investigational new drug ("IND") application, completion of multiple phases of pre-clinical and clinical trials to assess the safety and efficacy of the product, review of product labeling and warnings, and appropriate post-market surveillance.

5.     In or about January 2013, Ovascience notified the FDA that the Company unilaterally determined that AUGMENT fell within an exemption under the agency's regulations, which allows certain human cellular and tissue-based products ("HCT/Ps") to be tested and marketed without FDA licensure.  The justification for reduced regulatory oversight is that these products, referred to as "361 HCT/Ps," are considered low risk in terms of transmitting and spreading communicable diseases.  To qualify for this special designation, an HCT/P must meet four stringent criteria, including, among other things, that it involves only "minimal manipulation," *i.e.*, processing that does not alter the relevant biological characteristics of the cellular material.

6.     Since Ovascience did not have adequate financing to go through the more laborious pre-market testing and approval process, the AUGMENT Study, and indeed, the Company's future, hinged on the designation of AUGMENT as a 361 HCT/P.

7.     Although a special committee within the FDA, known as the Tissue Reference Group ("TRG"), provides formal opinions as to whether a product, such as AUGMENT, will be regulated as a 361 HCT/P, Ovascience declined to consult the TRG, and instead proceeded to enroll women in a first-in-human clinical trial without waiting for any clearance or assurances from the FDA.

8.     In its annual report, the Company appeared to be forthcoming about its aggressive posture with regulators, stating:

> We have not consulted the TRG.  We have, however, been contacted by the FDA regarding the AUGMENT Study, and a number of other matters relating to AUGMENT, including whether it qualifies for regulation as a 361 HCT/P.  We continue to believe that AUGMENT qualifies as a 361 HCT/P; however, the FDA could disagree with our conclusion.

9.     In actuality, ***the Company already knew that the FDA disagreed***, and that it was unlikely that AUGMENT would be regulated as a 361 HCP/T for numerous reasons, which the ***FDA had already raised with the Company***.  Specifically, on April 9, 2013, following a January 28, 2013 telephone conversation between the FDA and Company representatives, including Chief Operating Officer Alison Lawton, the FDA sent Ovascience a letter explaining that based on the information provided by the Company, "the removal of mitochondria and introduction into other reproductive tissue appears to be more than minimal manipulation."  Moreover, the FDA noted that "the addition of mitochondrial DNA to other reproductive tissue may raise additional regulatory concerns."  The Company was advised to contact the FDA "[f]or more information about applicable regulations or to schedule a pre-IND meeting," meaning that it was

4

likely that AUGMENT would be subjected to more rigorous regulatory scrutiny, the AUGMENT Study in humans could not go forward on an accelerated timeline, and the Company would be required to compile data and complete preclinical and clinical testing before the product could ever be sold in the U.S.

10.   Ovascience did not disclose to investors that it received the April 9, 2013 letter.

11.   Instead, the Company barreled ahead with enrollment for the AUGMENT Study, bolstering investor confidence that commercialization of AUGMENT remained on track. Moreover, in its public disclosures, the Company continued to omit material information concerning its interaction with the FDA, perpetuating the false and misleading impression that the FDA would be persuaded to adopt the Company's view that AUGMENT qualified as a 361 HCT/P, even though the risk that the FDA would disagree was already known and had already materialized.

12.   Then, on September 10, 2013, the Company disclosed that it was suspending enrollment of AUGMENT in the U.S. after receiving an "untitled" letter from the FDA (the "Untitled Letter") "questioning the status of AUGMENT as a 361 HCT/P and advising the Company to file an Investigational New Drug (IND) application."

13.   On this news, OvaScience shares declined $3.325 per share or more than 23%, to close at $10.95 per share on September 11, 2013.

14.   Unbeknownst to investors, the receipt of the Untitled Letter came as no surprise. The Company had known for months that AUGMENT raised regulatory concerns.  However, in a last ditch effort to allay investor concerns and prevent a massive sell-off of the Company's shares, Ovascience continued to hold out the possibility that regulatory approval of AUGMENT as a 361 HCT/P could still be secured, stating that "Ovascience anticipates having further

discussions with the FDA to present details on AUGMENT and its qualifications as a 361 HCT/P, and to determine the appropriate path forward.  Ovascience continues to believe that AUGMENT qualifies as a 361 HCT/P."

15.    Once again, however, Defendants withheld material information necessary to apprise investors of the true value of the Company's stock.  As the full contents of the Untitled Letter demonstrate, over the course of multiple conversations, including a telephone call on August 20, 2013, which was never disclosed to investors, Ovascience already attempted to persuade the FDA that AUGMENT fit the criteria to qualify as a 361 HCT/P, but the FDA remained unconvinced.    Indeed, the Untitled Letter reiterates the same position the FDA communicated in the April 9, 2013 letter, namely that "[t]he removal of mitochondria and the subsequent introduction of these organelles into other reproductive tissues appear to be more than minimal manipulation."

16.    In addition, Ovascience's decision to suspend the AUGMENT Study was not a voluntary choice as the Company portrayed.  As the Untitled Letter states:

> We are taking this opportunity to advise you that an IND is required for this study.
>
> *        *        *
>
> We would need to review a complete IND to assess fully your protocol, informed consent form, and Investigator's Brochure.  In general, it appears that your clinical protocol is not adequately designed to ensure the safety of the study subjects or offspring that may result from the autologous mitochondrial transfer product, AUGMENT.  As just one example, despite the fact that this is a first-in-human study of a technique that has the potential to create lifelong changes in children born as a result of the procedure, your study fails to provide longer term follow-up of any potential children.  In addition, the informed consent document does not adequately advise patients of the risks of your study.  Moreover, the protocol and Investigator's Brochure contain general statements about proof of concept and safety that are not well supported by the publications and cited data.

17.    Thus, Ovascience's plan to commercialize AUGMENT in the U.S. following completion of the proposed AUGMENT Study is no longer a viable option.  The Company now must pursue more time-consuming and expensive alternatives, which it may not have the ability to finance, thereby increasing the risk that the Company may never bring AUGMENT or any other product to market in the U.S.

18.    As a result of Defendants' wrongful acts and omissions, the precipitous decline in the market value of the Company's securities, and their ongoing perpetration of a fraud on the market, Plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

19.    The claims asserted herein arise under and pursuant to Sections l0 (b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  OvaScience maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part herein.

22.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

23.   Plaintiff Meriam Ratner, as set forth in the accompanying certification, incorporated by reference herein, purchased OvaScience securities at artificially inflated prices during the Class Period and was damaged upon the release of the corrective disclosure.

24.   Defendant OvaScience is a corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 215 First Street, Suite 240, Cambridge, MA 02142.   As of April 30, 2013, OvaScience's common stock has been trading on the NASDAQ Global Stock Market ("NASDAQ") under the ticker symbol "OVAS."  Prior to April 30, 2013, OvaScience's common stock was traded on the OTC Bulletin Board ("OTC")

25.   Defendant Michelle Dipp ("Dipp") has served at all relevant times as the Company's Chief Executive Officer and President.

26.   Defendant Christopher A. Bleck ("Bleck") has served at all relevant times as the Company's Vice President and Chief Commercial Officer.

27.   The defendants referenced above in ¶¶ 25 and 26 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Company Background**

28.   OvaScience is a biotechnology company developing proprietary products to treat female infertility.  The Company was formed in April 2011 with financing provided by several venture capital investment firms, including Longwood Fund, LP ("Longwood"), which still holds approximately 20 percent of the Company's stock.  Defendant Dipp and board members Richard Aldrich and Christoph Westphal are also partners of Longwood.

29.   The Company's core business is based on the scientific research of Dr. Jonathan Tilly.  In 2004, Dr. Tilly discovered the existence of certain stem cells, called egg precursor cells

("EggPCs"), within the ovaries of adult mice, which are thought to have the potential to mature into fertilizable eggs.  In subsequent research, Dr. Tilly discovered EggPCs in human ovaries. Ovascience believes that EggPCs can be utilized to replenish and rejuvenate a women's egg supply, thereby increasing the chances of pregnancy and "healthy live births."

30.    The Company's first product candidate is AUGMENT, which stands for autologous germline mitochondria energy transfer.  The product is based on the hypothesis that female infertility increases with age because of declining egg quality, which is attributable to accumulating mutations in the mitochondria.  Mitochondria are the cell's powerhouse, and if they cannot generate sufficient energy, an egg cannot be fertilized and develop into a viable embryo.  Thus, AUGMENT is a technique that isolates EggPCs from a patient, extracts fresh, high-energy-producing mitochondria from those cells, and then injects the mitochondria into the patient's eggs during a type of IVF in which sperm from the father is also injected.

31.    Mitochondria transfer is still a new and unproven area of reproductive science, which is not completely understood and which involves many potential risks both to mothers and children born utilizing mitochondria transfer techniques.  In 2001, following several adverse reports of birth defects in offspring resulting from similar cellular transfer procedures, the FDA notified several fertility treatment centers that due to a lack of safety and efficacy data, treatment of new patients would require submission of an Investigational New Drug ("IND") application.

32.    AUGMENT is slightly different from other methods in that the mitochondria are extracted from a women's own EggPCs, so there is no exogenous genetic material from a donor. However, as the FDA recently noted, because of the complexity of mitochondria, the effects on patients and offspring are still unknown, and to date, there have not been any trials of AUGMENT or any reported results in humans.

**Regulatory Framework Applicable To Ovascience's Products**

33.     The FDA typically must approve any new medical products before they can be sold in the U.S. to ensure that they are safe and effective for the purpose for which they are marketed. With respect to human cells, tissues, and cellular or tissue-based products ("HCT/Ps"), the FDA's authority is derived from 21 C.F.R. Part 1271, which sets forth a comprehensive, multi-tiered, risk-based approach for the regulation of HCT/Ps.  FDA's Part 1271 requirements are aimed at preventing the spread of communicable disease.

34.     For example, HCT/Ps meeting certain definitions are characterized as biological products, which may only be marketed upon approval of a biologic license application ("BLA"). Still other HCT/Ps are regulated as medical devices or drugs.  These HCT/Ps are subject to more intensive regulatory scrutiny and require FDA clearance, premarket approval, and/or submission of a new drug application ("NDA") before they can be sold.

35.     A third category of HCT/Ps, regulated solely under Section 361 of the Public Health Service Act ("361 HCT/Ps"), are considered lower risk (in terms of transmission of communicable disease) and exempt from premarket clearance and approval requirements, such as submission of a BLA, NDA, or IND.  An HCT/P qualifies for this exemption if it meets four criteria:  (1) it is minimally manipulated; (2) it is intended for homologous use as determined by labeling and advertising; (3) its manufacture does not involve combination with another article, with limited exceptions; and (4) either: (a) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function, or (b) the HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function and (i) is for autologous use, (ii) is for allogeneic use in a first or second degree blood relative, or (iii) is for reproductive use.

36.   Exemption from FDA premarket clearance and review provides a significant advantage, because it allows a company to market a product without the need to conduct multiple preclinical, animal and other trials and without the oversight of an independent institutional review board ("IRB") to review study results.  Since the premarket approval process can take years to complete, qualification as a 361 HCT/P saves time and expense, which represents a tremendous opportunity for a biotechnology company seeking to generate profits faster.

37.   Because the stakes are so high, a company can consult with a special committee within the FDA known as the Tissue Reference Group ("TRG"), which was created to address product specific questions concerning applicable regulation of HCT/Ps, in particular, whether a product fits the 361 HCT/P criteria.

**Ovascience Attempts To Bypass Regulators And Generate Quick Profits**

38.   As an early stage biotechnology company operating at a loss, Ovascience is under enormous pressure to demonstrate that it can commercialize its products and generate profits.  To date, most of its development activities have been financed by private placements of stock with venture capital investment firms, including Longwood, which subsequently profited by selling their Ovascience shares to the public in secondary offerings.

39.   To attract investors and support the Company's capital-raising efforts, Defendants formulated a business plan that provided for commercialization of AUGMENT on an accelerated timetable.  This plan required completing a first-in-human trial (the "AUGMENT Study"), the results of which would be utilized to support sales and marketing, with revenues expected in the second half of 2014.  Specifically, in its 2012 annual report, Ovascience explained:

> We plan to commercialize AUGMENT ourselves in the United States. We have initiated commercial preparations for AUGMENT and, assuming the final results of the AUGMENT Study are positive, plan to begin generating revenues from AUGMENT in the second half of 2014. To launch AUGMENT in the United

> States, we plan to recruit a dedicated sales and marketing team
> sufficient for us to call on the approximately 100 clinics with the
> highest IVF volumes. These clinics are responsible for the majority
> of the IVF cycles performed in the United States annually.

40.   However, Defendants knew that this plan could not be achieved if AUGMENT needed to clear regulatory hurdles first.   As Ovascience recognized, "the development and [regulatory] approval process is lengthy and resource intensive," and the Company could ill afford the time and expense associated with FDA involvement.

41.   With so much of the Company's future hinging on the FDA's characterization of AUGMENT, Ovascience could have consulted the TRG for an opinion before plowing ahead with a human trial.   Instead, Defendants opted to bypass the TRG and hire an outside consultant, who opined that AUGMENT satisfied the criteria for regulation as a 361 HCT/P, and thus, would not require the filing of an IND or be subject to the FDA premarket clearance and approval process.

42.   This opinion, a copy of which has never been publicly disclosed, bridged the financial gap in Ovascience's strategic plan by substantiating the Company's claim that AUGMENT could be tested and marketed without the burden and expense of obtaining FDA approval.

43.   Thereafter, the Company proceeded to enroll patients in the AUGMENT Study, seemingly on track to monetize AUGMENT on the timetable announced by the Company.

**Ovascience Withholds Material Information Concerning AUGMENT's Regulatory Status**

44.   In numerous disclosures, Ovascience repeatedly assured investors that it was confident in its belief that "the FDA will regulate AUGMENT as a 361 HCT/P rather than as a new drug or biologic, and therefore, that AUGMENT will not be subject to the requirement for an IND or FDA premarket review and approval."

45.   Although these disclosures also advised investors of the possibility that the FDA *could* disagree with its conclusions regarding AUGMENT, the Company framed this in terms of a risk that *might* materialize, but was still undetermined.  Specifically, the Company stated:

> We have not consulted the TRG. We have, however, been contacted by the FDA regarding the AUGMENT Study, and a number of other matters relating to AUGMENT, including whether it qualifies for regulation as a 361 HCT/P. We continue to believe that AUGMENT qualifies as a 361 HCT/P; however, the FDA **could disagree** with our conclusion.

46.   However, unbeknownst to investors, Defendants **already knew** that the FDA disagreed with Ovascience's conclusion.   Beginning as early as January 2013, Company executives, including Chief Operating Officer Alison Lawton and Karen Nichols, were in contact with the FDA to discuss the regulatory status of AUGMENT.    This dialogue between Ovascience and the FDA is documented in a letter from the FDA to Ms. Lawton, dated April 9, 2013 (the "April 9 Letter").  At that time, the FDA advised Ovascience that AUGMENT did not appear to satisfy the statutory requirement that the product involve only "minimal manipulation," and thus, may not be eligible for designation as a 361 HCT/P.  As the FDA stated:

> This is in follow-up to the January 28, 2013 telephone conversation between you and Ms. Karen Nichols of OvaScience and Dr. Patrick Riggins of this Office, regarding the autologous mitochondrial transfer product, AUGMENT.  As you may know, oocytes and other reproductive tissues are regulated as human cells, tissues, or cellular or tissue-based products (HCT/Ps) under 21 CFR Part 1271 … A reproductive tissue product that does not meet all the criteria in 21 CFR 1271.10(a) is not eligible for regulation solely under section 361 of the Public Health Service Act and 21 CRF Part 1271.
>
> Our understanding is that your autologous mitochondrial transfer product, AUGMENT, consists of cells isolated from a biopsy of ovarian tissue, which are processed to extract mitochondria that are then introduced into other reproductive tissues during the IVF process.  ***The removal of mitochondria and introduction into other reproductive tissue appears to be more than minimal manipulation***.  This is based on the limited information available;

please note that ***the addition of mitochondrial DNA to other reproductive tissue may raise additional regulatory concerns***. For more information about applicable regulations or to schedule a pre-IND meeting, please contact Dr. Patrick Riggins, Branch Chief, Regulatory Management Staff…"

47.   The full extent of Ovascience's discussions with the FDA remain undisclosed. However, having provided information concerning certain issues that could preclude regulation of AUGMENT as a 361 HCT/P, as well as the fact of discussions with the FDA, Ovascience was thereafter required to inform investors precisely which of those regulatory concerns the FDA actually was raising and how Ovascience proposed to address them.   Specifically, the FDA expressed concern that AUGMENT did not meet the regulatory criteria, because it involved more than "minimal manipulation."   This information was material to investors and necessary in order to make Defendants' statements not false and misleading.

48.   In these circumstances, where the Company's business plan, and indeed, its future prospects, depended on completion of the AUGMENT Study and early commercialization of AUGMENT, a blanket statement that the Company was "contacted by the FDA regarding the AUGMENT Study, and a number of other matters relating to AUGMENT" was wholly insufficient to apprise investors of the truth concerning the likelihood that AUGMENT would not qualify as a 361 HCT/P and that the Company would not generate sales in the second half of 2014 as anticipated.

49.   Even after receipt of the April 9 Letter, Ovascience continued to insist that it still believed that AUGMENT would be regulated as a 361 HCT/P and that the FDA could still be convinced.  Enrollment in the AUGMENT Study proceeded according to plan.

50.   Then, on September 6, 2013, Ovascience received another letter from the FDA (the "Untitled Letter").  The Untitled Letter reiterated what the FDA told Ovascience months earlier and raised numerous concerns regarding the AUGMENT Study.   The full contents of the

Untitled Letter, which was obtained in response to a request under the Freedom of Information

Act, are as follows:

>As communicated to you in our letter dated April 9, 2013, our understanding is that your autologous mitochondrial transfer product, AUGMENT, consists of cells isolated from a biopsy of ovarian tissue, which are processed to extract mitochondria and then introduced inot other reproductive tissues during the IVF process.  ***The removal of mitochondria and the subsequent introduction of these organelles into other reproductive tissues appear to be more than minimal manipulation.***  A reproductive tissue product that is more than minimally manipulated does not meet all of the criteria in 21 CFR 1271.10 for regulation solely under section 361 of the Public Health Service Act and an investigational new drug application (IND) would be required. From the August 20, 2013 phone call between you and Dr. Patrick Riggins, of this Office, it appears you are treating subjects under your clinical study protocol, even though you have not submitted an IND.

>***We are taking this opportunity to advise you that an IND is required for this study.***  Further, we are writing to express additional concerns based on our review of the protocols, Investigator's Brochure, and informed consent document that you submitted to the [redacted] for your AUGMENT study.  These documents were collected during our inspection of [redacted].

>We would need to review a complete IND to assess fully your protocol, informed consent form, and Investigator's Brochure.  In general, it appears that your clinical protocol is not adequately designed to ensure the safety of the study subjects or offspring that may result from the autologous mitochondrial transfer product, AUGMENT.  As just one example, despite the fact that this is a first-in-human study of a technique that has the potential to create lifelong changes in children born as a result of the procedure, your study fails to provide longer term follow-up of any potential children.  In addition, the informed consent document does not adequately advise patients of the potential risks of your study. Moreover, the protocol and Investigator's Brochure contain general statements about proof of concept and safety that are not well supported by the publications and cited data.

>To schedule a pre-IND meeting or for more information about applicable regulations, please contact Dr. Patrick Riggins, Branch Chief Regulatory Management Staff, at 301.827.5366 or

Patrick.Riggins@fda.hhs.gov.  We look forward to your pre-IND meeting request.

**Ovascience's Share Price Declines In Response To Disclosure Of The Untitled Letter**

51.    Forced to discontinue the AUGMENT Study and file an IND, Ovascience had no alternative but to apprise investors of the status of AUGMENT and the Company's existing business plan.  Rather than simply provide investors with a copy of the Untitled Letter, Defendants chose to issue a press release on September 10, 2013, which summarized the contents of the Untitled Letter.  The September 10, 2013 press release stated, in pertinent part:

> Ovascience has chosen to suspend enrollment of AUGMENT in the U.S. while moving forward with its plans for enrollment outside of the U.S.  On September 6, 2013, the Company received an "untitled" letter from the [FDA] questioning the status of AUGMENT as a 361 HCT/P and advising the Company to file an [IND] application.  Ovascience anticipates having further discussions with the FDA to present details on AUGMENT and its qualifications as a 361 HCT/P, and to determine the appropriate path forward.  Ovascience continues to believe that AUGMENT qualifies as a 361 HCT/P.

52.    Thereafter, Ovascience reassured investors by reporting that an AUGMENT study would be initiated outside the U.S. and that manufacturing capabilities had been expanded with a global supplier.  Overall, as stated in the press release, "[t]he Company [was] making steady progress in preparation for the study and launch of AUGMENT."

53.    Following this announcement, OvaScience shares declined $3.325 per share or more than 23% after higher-than-average trading volume, to close at $10.95 per share on September 11, 2013.

54.    However, the September 10, 2013 disclosure did not fully disclose the truth in that (1) suspension of the AUGMENT Study was mandatory, and not a voluntary decision made by the Company; (2) the FDA previously advised Ovascience that it disagreed with its conclusion that AUGMENT qualified as a 361 HCT/P, because AUGMENT involved more than "minimal

manipulation"; and (3) the FDA raised serious public health and safety concerns regarding the AUGMENT Study, including that among other things, it failed to ensure patient safety, failed to properly monitor potential children, did not adequately advise patients of the risks associated with the procedure, and was not supported by sufficient data.

55.     Ovascience previously disclosed to investors that the Company "initiated our AUGMENT Study in humans" and "initiated commercial preparations for AUGMENT, and, assuming the final results of the AUGMENT Study are positive, plan to begin generating revenues from AUGMENT in the second half of 2014."  OvaScience further disclosed that the Company had been contacted by the FDA, and that "the FDA could disagree with our conclusion" that AUGMENT qualified as an HCT/P.  As a result, during the course of its interactions with the FDA, Ovascience was obligated to disclose the actual concerns raised by the FDA and whether and how it intends to address them.  Likewise, to the extent that the FDA disagreed and/or continues to disagree with Ovascience's conclusion that AUGMENT qualifies as a 361 HCT/P, the Company must explain the basis for the disagreement and whether and how it intends to respond.  Once again, general statements surrounded by positive news of studies and plans to manufacture abroad and boilerplate warning that the FDA *could* disagree are inadequate where further details are readily-available and known by Defendants.  This information is material to investors in order to fully assess the Company's prospects and the value of the Company's stock and to make its statements not false and misleading.

56.     As a result of Defendants' wrongful acts and omissions, the precipitous decline in the market value of the Company's securities, and their ongoing perpetration of a fraud on the market, Plaintiff and other Class members have suffered significant damages.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

### The 2012 Annual Report

57.   On February 25, 2013, the Company filed an annual report with the SEC on a Form 10-K for the year ended December 31, 2012, which was signed, among others, by Defendants Dipp and Bleck.  In addition, the Form 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Dipp and Bleck, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.   The 10-K represented the following, in relevant part concerning AUGMENT:

> We believe that the FDA will regulate the HCT/Ps involved in the AUGMENT procedure as 361 HCT/Ps. This is because, in our view, both the mitochondria taken from egg precursor cells and the eggs into which those mitochondria are injected during IVF (1) are minimally manipulated, (2) are intended for homologous use only, (3) do not involve the combination of cells or tissue with another article and (4) are dependent upon the metabolic activity of living cells for their primary function and are for reproductive use.

59.   The statements referenced above were materially false and misleading and/or omitted material information, because they misrepresented and failed to disclose that (1) AUGMENT failed to satisfy the requirements of a 361 HCT/P; and (2) the FDA notified the Company on several occasions, including but not limited to, as early as January 2013, that it did not agree with the Company's conclusion that AUGMENT qualified as a 361 HCT/P, because the transfer of mitochondria from egg precursor cells to the egg of the patient did not qualify as "minimal" manipulation as required by the applicable regulations.

60.   The 10-K also stated:

> In late 2012, we initiated a study of AUGMENT in the United States in up to 40 women aged 38 to 42 who have failed two to five IVF cycles to assess both safety and effectiveness.  We refer to this study as our AUGMENT Study.   We have initiated

commercial preparations for AUGMENT and, assuming the final results of the AUGMENT Study are positive, plan to begin generating revenues from AUGMENT in the second half of 2014… We do not believe we will be required to seek premarket approval or clearance of AUGMENT from regulatory authorities in the United States or certain other countries.

61.     The 10-K further stated that "We have, however, been contacted by the FDA regarding the AUGMENT Study, and a number of other matters relating to AUGMENT, including whether it qualifies for regulation as a 361 HCT/P.  We continue to believe that AUGMENT qualifies as a 361 HCT/P; however, the FDA could disagree."

62.     The statements referenced in paragraphs 60 and 61 above were materially false and misleading and/or omitted material information because they misrepresented and failed to disclose that (1) AUGMENT failed to satisfy the requirements of a 361 HCT/P, because the mitochondrial transfer process involved more than "minimal manipulation"; (2) the FDA notified the Company on several occasions, including but not limited to, in January, April, August, and September 2013, that it did not agree with the Company's conclusion that AUGMENT qualified as a 361 HCT/P; (3) the FDA raised numerous other regulatory concerns regarding AUGMENT; (4) the FDA indicated that the Company should schedule a pre-IND meeting, suggesting that AUGMENT could neither be tested nor marketed as previously planned; and (5) AUGMENT would not generate sales revenue in the second half of 2014 due to the regulatory concerns raised by the FDA in its communications with the Company.

63.     As a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

**Quarterly Report for 1Q 2013**

64.     On May 15, 2013, the Company filed a quarterly report with the SEC on Form 10-Q for the quarterly period ended March 31, 2013, which was signed, among others, by Defendants

Dipp and Bleck (the "1Q 2013 10-Q").  In addition, the 1Q 2013 10-Q contained certifications

pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Dipp and Bleck, stating that

the financial information contained in the 1Q 2013 10-Q was accurate and disclosed any material

changes to the Company's internal control over financial reporting.

65.    The 1Q 2013 10-Q reiterated the Company's earlier statement that:

> In late 2012, we initiated a study of AUGMENT in the United
> States in up to 40 women aged 38 to 42 who have failed two to
> five IVF cycles to assess both safety and effectiveness.  We refer
> to this study as our AUGMENT Study.   We have initiated
> commercial preparations for AUGMENT and, assuming the final
> results of the AUGMENT Study are positive, plan to begin
> generating revenues from AUGMENT in the second half of
> 2014… We do not believe we will be required to seek premarket
> approval or clearance of AUGMENT from regulatory authorities in
> the United States or certain other countries.

66.    These statements were materially false and misleading and/or omitted material

information because they misrepresented and failed to disclose that (1) AUGMENT failed to

satisfy the requirements of a 361 HCT/P, because the mitochondrial transfer process involved

more than "minimal manipulation"; (2) the FDA notified the Company on several occasions,

including but not limited to, in January, April, August, and September 2013, that it did not agree

with the Company's conclusion that AUGMENT qualified as a 361 HCT/P; (3) the FDA raised

numerous other regulatory concerns regarding AUGMENT; (4) the FDA indicated that the

Company should schedule a pre-IND meeting, suggesting that AUGMENT could neither be

tested nor marketed as previously planned; and (5) AUGMENT would not generate sales

revenue in the second half of 2014 due to the regulatory concerns raised by the FDA in its

communications with the Company.

67.    The 1Q 2013 10-Q further stated: "We have not consulted the TRG.  We have,

however, been contacted by the FDA regarding the AUGMENT Study, and a number of other

matters relating to AUGMENT, including whether it qualifies for regulation as a 361 HCT/P. We continue to believe that AUGMENT qualifies as a 361 HCT/P; however, the FDA could disagree with our conclusion."

68.     These statements were materially false and misleading and/or omitted material information because they misrepresented and failed to disclose that, among other things, the Company communicated with the FDA as early as January 2013 and had received the April 9 Letter, advising that Company that, *inter alia*, "the removal of mitochondria and introduction into other reproductive tissue appears to be more than minimal manipulation" and suggesting that the Company contact the FDA "for more information about applicable regulations or to schedule a pre-IND meeting."  Therefore, (1) the FDA already disagreed with the Company's conclusion that AUGMENT qualified as a 361 HCT/P; (2) the FDA raised numerous other regulatory concerns regarding AUGMENT; (3) the FDA indicated that the Company should schedule a pre-IND meeting, suggesting that AUGMENT could neither be tested nor marketed as previously planned; and (4) AUGMENT would not generate sales revenue in the second half of 2014 due to the regulatory concerns raised by the FDA in its communications with the Company.

69.     As a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

**Quarterly Report for 2Q 2013**

70.     On August 13, 2013, the Company filed a quarterly report with the SEC on Form 10-Q for the quarterly period ended June 30, 2013, which was signed, among others, by Defendants Dipp and Bleck (the "2Q 2013 10-Q").  In addition, the 2Q 2013 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Dipp and Bleck, stating that the financial information contained in the 2Q 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

71.    The 2Q 2013 10-Q stated:

> December 2012, we initiated a study in the United States in which
> 40 women aged 38 to 42 who have failed two to five IVF cycles
> will receive AUGMENT to assess both safety and effectiveness.
> As part of the study, we will collect data on an additional group of
> women who have not received AUGMENT for a comparison
> group.  We refer to this study as our AUGMENT Study. We have
> initiated commercial preparations for AUGMENT and, assuming
> the results of the AUGMENT Study are positive, plan to begin
> generating revenues from AUGMENT in the second half of 2014.
> As data from the AUGMENT Study in humans in the United
> States  becomes  available,  we  will  seek  to  commercialize
> AUGMENT in certain other markets in the second half of 2014 …
> We do not believe we will be required to seek premarket approval
> or clearance of AUGMENT from regulatory authorities in the
> United States or certain other countries.

72.    These statements were materially false and misleading and/or omitted material

information because they misrepresented and failed to disclose that (1) AUGMENT failed to

satisfy the requirements of a 361 HCT/P, because the mitochondrial transfer process involved

more than "minimal manipulation"; (2) the FDA notified the Company on several occasions,

including but not limited to, in January, April, August, and September 2013, that it did not agree

with the Company's conclusion that AUGMENT qualified as a 361 HCT/P; (3) the FDA raised

numerous other regulatory concerns regarding AUGMENT; (4) the FDA indicated that the

Company should schedule a pre-IND meeting, suggesting that AUGMENT could neither be

tested nor marketed as previously planned; and (5) AUGMENT would not generate sales

revenue in the second half of 2014 due to the regulatory concerns raised by the FDA in its

communications with the Company.

73.    The 2Q 2013 10-Q further stated: "We have not consulted the TRG.  We have,

however, been contacted by the FDA regarding the AUGMENT Study, and a number of other

matters relating to AUGMENT, including whether it qualifies for regulation as a 361 HCT/P.

We continue to believe that AUGMENT qualifies as a 361 HCT/P; however, the FDA could disagree with our conclusion."

74.    These statements were materially false and misleading and/or omitted material information because they misrepresented and failed to disclose that, among other things, the Company communicated with the FDA as early as January 2013 and had received the April 9 Letter, advising that Company that, *inter alia*, "the removal of mitochondria and introduction into other reproductive tissue appears to be more than minimal manipulation" and suggesting that the Company contact the FDA "for more information about applicable regulations or to schedule a pre-IND meeting."   The Company also communicated with the FDA on other occasions, including in August 2013.   Therefore, (1) the FDA already disagreed with the Company's conclusion that AUGMENT qualified as a 361 HCT/P; (2) the FDA raised numerous other regulatory concerns regarding AUGMENT; (3) the FDA indicated that the Company should schedule a pre-IND meeting, suggesting that AUGMENT could neither be tested nor marketed as previously planned; and (4) AUGMENT would not generate sales revenue in the second half of 2014 due to the regulatory concerns raised by the FDA in its communications with the Company.

75.    As a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired OvaScience securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of

the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

77.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, OvaScience securities were actively traded on the NASDAQ or OTC.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by OvaScience or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

78.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

79.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

80.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of OvaScience;

- whether the Individual Defendants caused OvaScience to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of OvaScience securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

82.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- OvaScience securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the OTC or NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold OvaScience securities between the time the defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

83.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

86.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of OvaScience securities; and (iii) cause Plaintiff and other members of the Class to purchase OvaScience securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

87.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for OvaScience securities and options.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about OvaScience's finances and business prospects.

88.    By virtue of their positions at OvaScience, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

89.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of OvaScience, the Individual Defendants had knowledge of the details of OvaScience's internal affairs.

90.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of OvaScience.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to OvaScience's

businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of OvaScience securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning OvaScience's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased OvaScience securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

91.     During the Class Period, OvaScience securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of OvaScience securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of OvaScience securities were substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of OvaScience securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

92.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false financial statements to the investing public related to its prospects for FDA approval.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

94.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.    During the Class Period, the Individual Defendants participated in the operation and management of OvaScience, and conducted and participated, directly and indirectly, in the conduct of OvaScience's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding OvaScience's interactions with the FDA.

96.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to OvaScience's financial condition and results of operations, and to correct promptly any public statements issued by OvaScience which had become materially false or misleading.

97.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which OvaScience disseminated in the marketplace during the Class Period concerning OvaScience's financial prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause OvaScience to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of

OvaScience within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of OvaScience securities.

98.    Each of the Individual Defendants, therefore, acted as a controlling person of OvaScience.    By reason of their senior management positions and/or being directors of OvaScience, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, OvaScience to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of OvaScience and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

99.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by OvaScience.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated:  June 6, 2014                                          By her attorneys,


/s/ Edward F. Haber
Edward F. Haber (BBO#215620)
Adam M. Stewart (BBO#661090)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: 617-439-3939
Facsimile: 617-439-0134
ehaber@shulaw.com
astewart@shulaw.com


**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
Michele S. Carino
600 Park Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665


**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184


*Counsel for Plaintiff*